IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

**STAN SMITH,**

           Plaintiff,                              **Case. No. 6:21-cv-1422-MC**

        **v.**                                      **OPINION AND ORDER**

**PITNEY BOWES, INC. LONG-TERM
DISABILITY PLAN,**

           Defendant.

_____

**MCSHANE, Judge:**

      Pending before the Court are cross motions for summary judgment in this ERISA dispute regarding long term disability benefits. Because the Plan did not abuse its discretion in determining that Plaintiff is only entitled to 50% of his former salary, Defendant's motion for summary judgment, ECF No. 22, is GRANTED.

<u>**BACKGROUND**</u>

      Plaintiff Stan Smith began working at Defendant Pitney Bowes Inc. in April 1985. In the fall of 1993, Plaintiff opted into the Plan's "buy up" option for 66.6% long term disability benefits (rather than the standard 50%). The parties agree the buy up election took effect on January 1, 1994. Plaintiff's last working day was Tuesday, December 28, 1993. Plaintiff called in sick the next day, December 29, 1993. Plaintiff began to receive his short term disability benefits as of December 30, 1993.

On January 5, 1994, Plaintiff first saw a doctor for depression. Plaintiff's doctor concluded that Plaintiff's depression prevented him from performing his regular job duties. The main dispute here is Plaintiff's disability onset date. Plaintiff argues he was disabled on January 5, 1994 (and thus entitled to the buy up election that went into effect four days earlier). Defendant argues Plaintiff was disabled on December 30, 2022 (and thus not entitled to the buy up option that went into effect two days later).

Six months later, on July 8, 1994, Defendant informed Plaintiff he was approved for long term disability benefits, effective as of July 1, 1994. AR 187. The notice stated, "The Plan provides for monthly income equal to 50% of your monthly earnings." AR 187. The notice did not notify Plaintiff of any options for appeal in the event he disagreed with the determination. The notice did provide a contact's phone number for Plaintiff to call with questions, along with an address to send correspondence via mail. AR 188.

Four years later, in July 1998, Plaintiff sent a letter requesting a written explanation regarding his eligibility for back pay. AR 246. Specifically, Plaintiff stated "I need confirmation that I was eligible for LTD benefits of [66.6%] beginning Jan. '95." AR 246. In April 2000, Plaintiff again wrote the "PB Benefits Manager" with questions regarding increased deductions. AR 247. Plaintiff noted the issues in his July 1998 letter had not been resolved and reiterated that although he paid for the buy up option, he only received the benefit of 50% his salary. AR 248.

In September 2007, Defendant sent Plaintiff a letter stating, "a recent audit of records . . . has uncovered an error in your disability payments, dating back to June 6, 1994." AR 196. The statement indicated the Plan had erroneously determined the monthly 50% benefit to be $1574.88 rather that the correct amount of $1641.00. AR 196. The Plan noted that in addition to correcting the error going forward, it would send Plaintiff a lump sum payment of $10,360.80 for

the 13 years of underpayments. AR 196. Plaintiff responded with a letter the next month, again noting that "I had elected and paid for 66 2/3% benefit coverage." AR 251. Additionally, Plaintiff sent paycheck stubs from 1997 indicating Defendant had deducted the buy op option from his benefits. AR 251.

In January 2009, Plaintiff sent a letter discussing deductions he elected for 2009 and some insurance coverage issues he recently experienced. AR 252. Plaintiff requested a written response regarding those issues, along with another request regarding his entitlement to the 66.6% benefit due to his buy up election. AR 251. There do not appear to have been any further communications between the parties over the next decade.

During a September 2019 phone call with Defendant's Absence Management Department, Plaintiff raised a few issues. AR 191. One of the issues was Plaintiff's belief that he was entitled to a 66.6% benefit. AR 191. On October 8, 2019, Defendant sent Plaintiff a written response regarding that phone call. As for the calculation of Plaintiff's benefit:

> With regard to your claim that you should have been paid a 66-2/3% LTD benefit rather than at 50%, our records and practices indicate otherwise. According to our records, your Plan benefit is properly being paid at 50% of pre-disability income. Prior to commencing STD, sometime in the fall of 1993 (during Open Enrollment), you elected the 66-2/3% buy-up effective January 1, 1994. I understand that you began receiving STD benefits under the Pitney Bowes Inc. Short Term Disability Policy (the "STD Policy") on December 30, 1993 (the "1993 Total Disability"). At the time the 1993 Total Disability commenced, the 66-2/3% buy-up was not in effect. Given that your Plan benefit relates to your 1993 Total Disability, the Plan properly paid (and pays) at 50%. With respect to your 66-2/3% buy-up election, it applied to any Total Disability commencing in 1994. Had you returned to work in 1994 following your 1993 Total Disability, and suffered an unrelated disability requiring LTD benefits, the Plan would have paid you at 66-2/3% per your 1994 election.

AR 190-91.

The letter contained, apparently for the first time, written instructions regarding Plaintiff's right to appeal under the Plan. AR 192. Plaintiff responded to the October 2019 letter

with his own letter dated March 24, 2020. AR 180-81. Plaintiff raised several issues, one of which was his continued belief that he was entitled to the 66.6% buy up benefit. AR 181. Plaintiff noted recent conversations he had with an employee of Defendant. AR 180. He also stated that over the years, he had several phone conversations with at least four employees in both the Long Term Disability department and the Benefits department. AR 181. Plaintiff stated that the 1994 Benefits Handbook allowed employees to apply for short term disability benefits only after four days of absences. Plaintiff stated he called in sick on December 29, 1993, and that he "was paid as a sick day" for that day. AR 181. Plaintiff argued the next four workdays should also have been paid as sick days. AR 181. Plaintiff closed his letter by writing, "I never thought this letter could be written. . . . It is mandatory that my requests be submitted to the proper higher authorities above LTD so they can be approved without the bias of past unsubstantiated denials." AR 181.

On October 27, 2020, Defendant informed Plaintiff the Pitney Bowes Welfare Plan Administrative Committee (the "Committee") would treat Plaintiff's March 24, 2020 letter as a formal appeal under ERISA. AR 226. The letter informed Plaintiff that after reviewing Plaintiff's appeal during a meeting earlier that month, the Committee denied Plaintiff's appeal. AR 226. The Committee concluded that because the Plan required the filing of appeals within 180 days of a claim's denial, Plaintiff's appeal was time-barred. AR 226-27.

> The Committee recognizes that this issue is of great importance to you and your family. While the Committee's decision was not based on the merits of your appeal, it felt that it was appropriate to provide you with an explanation as to why your benefits are calculated at the 50 percent rate. As explained below, even if your appeal had been timely filed, the Committee would not have been able to grant your request for benefits payable at the 66-2/3 percent rate.

> Your concerns relate to the buy-up option offered to employees who elect to have premiums deducted from their paychecks in order to receive Plan benefits at the rate of 66-2/3 percent of pre-disability income, rather than at the 50 percent rate in the event of a Total Disability (the "Buy-Up"). The Committee understood that

you elected the Buy-Up in 1993, and that such election became effective as of January 1, 1994. That is, your Buy-Up applied to a "Total Disability" that commenced in 1994.

The record indicates that your disability commenced on December 30, 1993; the long-term disability benefits for that disability began on July 1, 1994, after you exhausted short term disability ("STD"). In your correspondence, you explained that your STD benefit payments commenced in January 1994, five days after your first day out of work. However, the Buy-Up does not apply to disabilities whose payments begin in 1994. **Instead, eligibility for the Buy-Up is measured as of the date the underlying disability began.**

You also provided a copy of the "Time Out' notice in support of your appeal. The Time Out notice is inapplicable given that it took effect February 1994, subsequent to the start of STD, and even if the Time Out notice was applicable, it does not override or amend the general rule that the Buy-Up is determined based on the date the disability itself began. While employees are instructed to call in STD claims four days after their initial absence, benefit determinations apply retroactively to the first day out of work—that is, the date that the disability begins. This practice is standard administrative procedure to ensure that STD claims are not filed for minor illnesses that do not result in a covered "Total Disability."

For these reasons, the Committee would have been unable to grant your appeal for an increased Plan benefit. While we concede that your disability began shortly before the effective date of the Buy-Up, federal law prohibits us from making special exceptions from the Plan's rules. (By comparison, if an auto insurance policy is purchased with an effective date of January 1st, the insurer would not be expected to pay for damages caused by an auto accident that occurs before that date.)

AR 227-28.

In April 2021, Plaintiff responded in a letter stating, "Only recently have I received any written response regarding my 66 2/3rds back pay and with that my first opportunity to appeal (now over a quarter of a century later)." AR 264. Plaintiff stated he "was not aware of any time restraint regarding my back pay much less was I given any other avenue of recourse or opportunity to recover my money . . . ." AR 264. Plaintiff reinforced his belief that he was entitled to the 66.6% buy up benefit, noting he was out sick until receiving a diagnosis of disabled from his physician on January 5, 1993. AR 265. "The doctor's diagnosis was going

forward and did not cover any dates in 1993. . . . Prior to 1/05/94 I had never been treated or

diagnosed for my disabling condition. Per LTD rules my disability began on January 05, 1994."

AR 265.

On June 17, 2021, Defendant responded to Plaintiff's April 16, 2021 letter. AR 280.

Regarding the buy up election, the Committee stated:

> First, you allege that you were not aware of time constraints for filing an appeal.
> For reasons stated in the October 27th letter, the Committee was unable to grant
> your request for an appeal as it was untimely. More importantly, the denial letter
> also explained that "[e]ven if your appeal had been timely filed, the Committee
> would not have been able to grant your request for benefits payable at the 66-2/3
> percent rate." As the October 27th letter explains in greater detail, your Buy-Up
> election applied to disabilities commencing in 1994. Your disability commenced
> in December 1993. For that reason, the 66-2/3 Buy-Up election does not apply to
> your disability. In summary, even if your claim had been timely filed, the timing
> of your disability makes you ineligible to receive the 66-2/3 Buy-Up amount. We
> have no further response to this claim.

AR 280.

The Committee also responded to Plaintiff's claim that Buy-Up deductions continued to

be taken from his paychecks through 1997. AR 281. The Committee noted that although

Plaintiff's January 31, 1996 paystub did not contain the deduction, a further investigation

(initiated by Plaintiff's submission of a December 31, 1996 paystub containing the deduction)

"revealed that a premium change was recorded on March 29, 1996 to reflect a "66-2/3% POST-

TX OPTION" with an effective date retroactive to January 1, 1996. While we cannot be certain

why this occurred, it is possible that a miscommunication occurred within the Disability or

Payroll Departments." AR 282. The Committee stated a check, with interest, would soon be sent

to correct the mistaken deductions. AR 281.

## **STANDARDS**

The Court must grant summary judgment if there is no genuine issue of material fact and

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is

"genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

When a plan subject to ERISA unambiguously "confer[s] discretion on the administrator 'to determine eligibility for benefits or to construe the terms of the plan,'" courts review the denial of benefits under an abuse of discretion standard. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Generally, this means courts will determine whether the administrator's decision is a reasonable interpretation of the record or, in contrast, illogical or unsupported by the record. *Black v. Hartford Life Ins. Co.*, No. 3:17-CV-1785-HZ, 2019 WL 2422481 at *2 (D. Or. June 10, 2019). Here, the Plan states:

7.2    <u>The Committee(s)</u> – The general administration of the Plan and the responsibility for carrying out the provisions thereof shall be placed in the Employee Benefits Committee. The Employee Benefits Committee shall have powers necessary to enable its members properly to carry out their duties, subject at all times to the limitations and conditions specified in or imposed by the Plan.

* * * *

7.4    <u>Interpretation of Plan</u> – The determination or action of the Employee Benefits Committee with respect to any question arising out of or in connection with the administration of the Plan shall, to the extent not inconsistent with the provisions

of the Plan, be final, conclusive, and binding upon all persons having an interest
in the Plan.

AR 10.

The parties agree that this language unambiguously grants discretion for determining
benefits or eligibility of the Plan upon the Committee and, consequently, that the abuse of
discretion standard applies. Additionally, the Ninth Circuit, in reviewing Defendant's Plan,
previously concluded that "an abuse of discretion standard is appropriate." *Burke v. Pitney
Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1024 (9th Cir. 2008). Plaintiff, however,
argues that Defendant's conflicts of interest require this Court to take a harder look at the
Committee's denial of benefits.

Plaintiff is correct that because Defendant both funds and administers the Plan, there is a
structural conflict of interest. *See id*. at 1024. But, as Plaintiff appears to acknowledge, this does
not mean the Court substitutes a more stringent standard of review when checking the
Committee's work. *Abatie*, 458 F.3d at 965 ("Abuse of discretion review applies to a discretion-
granting plan even if the administrator has a conflict of interest."). "First, and most significantly,
the Plan's structural conflict is mitigated by the fact that benefits paid by Pitney's Plan are paid
out of the Plan's Trust; they are not paid directly by Pitney, so that there is no *direct* financial
impact on Pitney resulting from the distribution of benefits." *Burke*, 544 F.3d at 1025. That said,
the Court must consider this conflict because, "even though benefits are not paid directly by
Pitney, Pitney obviously still has a financial incentive to keep claims' experience under the Plan
as low as possible—the less the Trust pays out as benefits, the less Pitney will ultimately need to
contribute to the Trust to maintain its solvency." *Id.* at 1026. This conflict, like the irregularities
discussed below, is simply a "factor" to consider in determining whether the administrator
abused its discretion." *Abatie*, 458 F.3d at 959 (quoting *Firestone*, 489 U.S. at 113).

8—OPINION AND ORDER

Another relevant factor is the fact that Pitney alone does not fund the trust. Instead, Pitney's employees also contribute to the trust. This fact "tends to lessen the structural conflict of interest." *Id*. That said, "[b]ecause the Plan is administered by Pitney, rather than an insurer, this aspect of the Plan tends to increase the Plan's structural conflict of interest[.]" *Burke*, 544 F.3d at 1027. The Court notes, however, that the Committee at issue is comprised of one Pitney employee along with three non-employees. Lebowitz Decl. Ex. A; ECF No. 22-1. This factor decreases, at least in some fashion, the conflict discussed in *Burke*. In short, although the abuse of discretion standard remains notwithstanding a conflict of interest, this "review [is] informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." *Abatie*, 458 F.3d at 967.

Plaintiff next argues that Defendant's conflicts of interest, reinforced by multiple errors Defendant made over nearly three decades, require the Court to give less deference to the Committee's decision. The Court finds that although mistakes were made, Plaintiff generally overstates the errors. For example, after pointing to the record containing Plaintiff's letters sent in 1998, 2000, 2007, and 2009 (and Plaintiff's references in those letters to his phone calls to Defendant), Plaintiff argues "The Plan did not respond to any of the letters or telephone calls for 21 years, finally responding with a denial on October 9, 2019." Pl.'s Resp. 12; ECF No. This argument lacks support in the record. In Plaintiff's 1998 letter to the Pitney Bowes Benefits Manager, Plaintiff references three phone conversations with the manager where they discussed Plaintiff's eligibility to the 66.6% buy up benefit. AR 246. In his 2007 letter to Linda Casey in the Disability Management Department, Plaintiff references written correspondence from Pitney Bowes regarding Plaintiff's questions regarding his deductions. AR 183. In his 2009 letter to a different Pitney Bowes employee, Plaintiff references "our phone conversation." AR 251.

Although there appear to be no communications, in any form, between the parties over the next decade, a 2019 letter from the Absence Management Department to Plaintiff referenced a phone conversation the prior month where Plaintiff raised several concerns, including his concerns regarding the buy up benefit. AR 190. Plaintiff's March 2020 appeal letter notes recent "conversations I have had with Jessica," AR 180, and references many conversations over the past 26 years with Pitney Bowes' Long Term Disability employees regarding his entitlement to the buy up benefit, AR 181. Rather than complete silence in the face of Plaintiff's informal complaints, the record instead indicates that Plaintiff spoke to numerous people in multiple departments and was not happy with the answers he received.

Plaintiff points to other administrative or technical errors, outlined in the background section above, as further indication of Defendant's bias and conflict of interest. The Court finds these were administrative errors that, while unfortunate, are not indicative of a general pattern of bias on Defendant's part. In fact, one of these errors indicates the opposite; i.e., that Defendant was doing its best to administer the Plan in a consistent and fair manner. In 2007, after no communications with Plaintiff for seven years, Defendant discovered, during "a recent audit of records," that it "erroneously calculated" Plaintiff's 50% benefit and would issue Plaintiff a lump sum payment of over $10,000. AR 196. Neither party noticed the underpayment for over 13 years. That Defendant performs audits to ensure the accuracy of payments and, without solicitation, notifies underpaid parties of underpayments does not point to an inherent bias in administering the Plan against the interests of its members in order to reduce outflows from the trust. In fact, to the Court, this demonstrates the opposite. Taken together, the Court finds the errors consist of the "minor, technical" variety as opposed to "an egregious conflict." *Abatie*, 458 F.3d at 968.

Plaintiff's arguments to the contrary are unconvincing. Plaintiff argues that, in violation of the Plan's procedures, Defendant failed to give Plaintiff notice of his right to appeal the "denial" of his claim to the buy up benefit. Specifically, Plaintiff argues, "If the 1994 acceptance of Mr. Smith's LTD claim was intended as a partial-denial, the plan administrator failed to comply with any of the requirements of Section 7.8, thereby denying Mr. Smith a timely appeal." Pl.'s Resp. 14. While the Plan requires written notice with appeal rights included in the denial of any claim, the 1994 notice to Plaintiff was not a denial of any claim. Rather, the notice clearly informed Plaintiff that his claim for long term benefits had been approved. AR 186. The notice clearly and unambiguously informed Plaintiff that he was entitled to the 50% benefit and included the specific benefit amount calculated by Defendant. AR 186. Only four years later, when Plaintiff started contacting various departments, did Defendant learn, for the first time, that Plaintiff believed he was entitled to the buy up benefit. As demonstrated above, the parties then had a sporadic, informal back and forth for the next 25 years regarding the buy up benefit. Ultimately, the Plan treated Plaintiff's March 24, 2020 letter addressed to "Top Official over LTD" as an official appeal. AR 169. The Court does not intend to minimize the frustration Plaintiff experienced over the years. Rather, the Court points out that this was a somewhat unusual fact pattern caused by (1) Defendant's original ignorance of the fact that Plaintiff felt entitled to the buy up option; (2) four years of silence; followed by (3) a sporadic, apparently informal back and forth between the parties.

"The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. *Abatie*, 458 F.3d at 968. This is not a case with rampant, ongoing procedural errors. "Instead, [this case involves] the

more ordinary situation in which a plan administrator has exercised discretion but, in doing so, has made procedural errors." *Id*. at 972.

Turning to the merits, the Court assumes, without deciding, that Plaintiff's claim is not barred by the statute of limitations. As noted, the 1994 notice clearly and unambiguously informed Plaintiff that he had been approved for benefits at the 50% level. It certainly appears that Plaintiff should have known, at that time, that any claim he had to the buy up benefit was either (1) unconsidered or (2) denied. Had Plaintiff reviewed the Plan, he would have seen that he had 90 days to "submit a written request for reconsideration of the claim to the plan administrator[.]" AR 12. That said, the Court notes the fact pattern here shares many similarities with the facts in *Withrow v. Bache Halsey Stuart Shield*, 655 F.3d 1032 (9th Cir. 2011) where the Ninth Circuit concluded an informal back and forth over many years, unaccompanied by any written notice of the right to appeal, did not bar that plaintiff's claims.

But even assuming Plaintiff's claim is not time barred, Defendant did not abuse its discretion in concluding Plaintiff was not entitled to the buy up benefit. Plaintiff argues that per the Plan, he was "actively working" on January 1, 2014, and therefore entitled to the buy up benefit. Defendant's determination, however, that Plaintiff's disability onset date was December 30, 1993, is a reasonable interpretation of the record and not inconsistent with the Plan. The Plan states "Each eligible Employee shall become a Participant on the date that he becomes eligible, provided that he is then actively at work for the Company." AR 5. The Plan provides:

> Actively at Work – A Participant who is not actively at work for the Company on any day because such day is a non-work day, a holiday, or a day of vacation will nevertheless be deemed to be actively at work for the Company on such day, unless it is determined by the Employee Benefits Committee on the basis of a physician's statement or accident report that he was Totally Disabled on such day.

AR 5.

The Committee noted that "your Buy-Up applied to a 'Total Disability' that commenced in 1994." AR 227. The Committee pointed out (1) "The record indicates that your disability commenced on December 30, 1993" and (2) "eligibility for the Buy-Up is measured as of the date the underlying disability began." AR 227. Further, "While employees are instructed to call in STD claims four days after their initial absence, benefit determinations apply retroactively to the first day out of work—that is, the date that the disability begins. This practice is a standard administrative procedure to ensure that STD claims are not filed for minor illnesses that do not result in a covered 'Total Disability.'" AR 227. This conclusion is supported by the record and is a reasonable interpretation of the Plan.

It is undisputed that Plaintiff received short term disability benefits as of December 30, 1993. Plaintiff continued to receive those benefits until approved for long term disability benefits beginning July 1, 1994. Plaintiff did not return to work after December 30, 1994. While Plaintiff did not see a physician or receive a diagnosis until January 5, 1994, the Committee did not abuse its discretion in concluding that one who applies for and receives disability benefits is Totally Disabled as of that date. Although the timing here is unfortunate for Plaintiff, the Committee's decision is a reasonable interpretation of the record. The Court notes that although it reviews the Committee's decision for an abuse of discretion, the result here would be the same had the Court reviewed the Committee's decision de novo.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

13—OPINION AND ORDER

## <u>CONCLUSION</u>

Defendant's Motion for Summary Judgment, ECF No. 22, is GRANTED.

IT IS SO ORDERED.

DATED this 19th day of August, 2022.


_____/s/ Michael McShane_____
**Michael J. McShane**
**United States District Judge**